25118 In Re. Residential Capital Okay, just so I can make sure everybody understands what we're doing here, and if I understand it, we're going to have arguments on behalf of the trust, and then arguments on behalf of the classes, and then we're going to have, on the other side, counsel for certain underwriters is going to argue with counsel for Swiss Re, and in arguing for Swiss Re, any cross-appeal issues or issues that have been characterized as cross-appeal issues, that would be your opportunity to argue those as well, and then we'll go back to rebuttal. Attorney General. Good morning, Your Honor. David Chauffeur for the trust. As a purely contract business, custom and practice in the insurance law relies heavily on precedent, and the strict meaning applied to the phrase, the insured, known as the innocent insured principle, is deeply entrenched in New York common law, and insurers and insureds have been relying on this principle for decades. So it is remarkable that neither the district court nor the insurers actually considered the actual language used in the fees exclusion and demer clause in light of this consistent industry custom in years of cases. I also want to emphasize three other things that insurers do not contest. They do not contest that the courts unanimously apply the insured to mean only the insured engaged in the prohibited conduct. They do not address the shortcomings of the district court's simple hypothetical or how it misunderstands the insured principle, and they don't address the mess created in the C-3 exclusions caused by the district court's application of the demer clause. Can I ask, the fees short, and I understand, are retrocated that you cite, and it seems like most of them involve situations where there are potentially independently liable insurers who are also under the same policy, and that language is used to distinguish from exclusions based on the conduct of one that wouldn't apply as to the other. Can you tell me your best case for a derivative liability situation in which the court put weight on the term reassured in applying an exclusion? I agree. Probably the most important where the expansion of the ambit of assured is based on the legal responsibility for another party's conduct and how it changes nothing in the case of Harleysville, which is this court's case. In Harleysville, this court addressed the proper interpretation of the insured where an additional insured is seeking coverage. By definition, an additional insured is only an insured because of vicarious liability of another, in that instance, the name insured. Notwithstanding the fact that the additional insured can only be an insured for the vicarious liability of another, this court found the use of the definitive article, the, is positive and refers solely to whichever insured is seeking coverage. Because the intent of the Deamer Clause was to mirror the second route to coverage under the insuring agreement, and as a result, an additional group of entities can trigger some exclusions, but there's nothing in the Deamer Clause in the unremarkable act of expanding the definition of the term assured that gives a basis to ignore the drafter's deliberate choice of the definitive article, the, in the fees exclusion and ignored 60 years of precedent. The two other cases are cases that both parties litigated and addressed below, but the district court ignored, and that's Kaepernick and Century. Kaepernick and Century both stand for the proposition about how insurers can overcome the initial insured doctrine. In both those cases, the exclusion, excluded coverage based on the coverage of the insured or non-insured entities or persons for whom the insured is legally responsible, and the court focused on the fact that there was a disjunctive in the exclusion, the insured or non-insured entities or persons for whom the insured is legally responsible. The insurers did not use or in the fees exclusion, and it was an error for the district court to impose that or. Page 16 of its order is kind of the classic example. When you use the term in this insured doctrine, which is, I think, sort of helpful here to highlight the disconnect that I'm struggling with, which is that the cases involve disqualifying conduct by somebody who's insured, and whether or not that disqualifying conduct disqualifies somebody else who didn't do the bad thing or didn't engage in the disqualifying conduct. Here, we're not dealing with disqualified conduct. We're dealing with what the category of claims that's covered and then what the category of the claims that's excluded from the coverage. And I guess that's, when I was asking for a case, I'm realizing I framed it in terms of derivative liability, but I want to ask whether the cases you cite in would also be the strongest cases you have in terms of the nature of the exclusion and Respectfully, it is conduct. It's the receipt of improper. It's the receipt of fees is what's triggering this exclusion. And in Kalbennick and Century, it's an assault and battery exclusion, right? And the conduct is so noxious. Insurers don't want to insure anyone who, they don't want to underwrite whether the assault and battery is by an insured or by a person who's not insured for whom the insured is legally responsible. And so they use the disjunctive or. But for fees exclusion, the industry has determined that conduct is not so noxious. And so in those instances, the use of the word be assured is reflecting that reasoned policy decision that the entity that received the fees is excluded from cover, but other entities that may be found vicariously liable for the receipt of fees aren't. And that's the nature. That's actually the whole genesis of the innocent insured doctrine. The notion was intentional conduct. You can't insure against intentional conduct, but there's no public policy against insuring against when that being found vicariously liable for that conduct. That insured is not truly innocent, right? It's being held vicariously liable for another's conduct. But that isn't so noxious so as to not be insurable. And that's the So here, across the C3 exclusions, Your Honor, the insurers use the, an, or any. And when they wanted conduct to be so noxious, whether it's employment claims, whether it's commingling of funds, they had a blanket exclusion, which had never used the term assured at all. It just said this is excluded. And so the insurers were very sophisticated and understand exactly how to scope exclusions in multi-insured policies. The district court's error is it's focused on an ironclad consistency between the breadth of the insuring clause and the breadth of the fees exclusion because that's ultimately misguided when one's considering multi-insured E&O coverages. And all one has to look at is the other C3 exclusions to understand that. And the district court couldn't reconcile its expansive definition of the phrase the assured, which of course isn't modified by the C8, the license revocation exclusion, the district court recognized its interpretation would make it unbelievably broad. First it said, well, maybe the concept of C8 may mean that the Deamer clause doesn't reach it. Then it said, well, this overbreadth problem caused by its interpretation could be solved by the court's refraining from applying the Deamer clause, notwithstanding the plain meaning. That's no way to read insurance policies. The interpretation of the bankruptcy court in the plainness doesn't require any of that gymnastics. And it's the only interpretation that gives meaning to all of the drafter's choices in C3 regarding the, an, or any. And I would note one thing. Several of the exclusions in C3 apply to any assured. The exclusion's any assured, Your Honor. But the exception is for the assured. The district court's interpretation makes no sense because in these exceptions there would be no need to preserve coverage for persons or entities that aren't insured. I invite the court, for example, to apply the district court's interpretation to the exception for defense costs for the assured in Exclusion C10 or extra-contractual damages assessed against the insured in C27. Ultimately, at bottom, business people in New York for 50 years relied on the fact that these courts across the nation and in New York give strict effect to the use of the insured in exclusions. And the district court's failure to use that custom and usage history to determine that the plainness interpretation is at least reasonable is error. And in most... Can I ask you one thing before you sit down for your time's up here? The definition of loss in the policy expressly excludes fees, premiums, or commissions charged to customers or clients. And so one of the things I was kicking around, and it seems like the district court, one of the virtues of the district court's interpretation is that it creates a consistency between the exclusion and the definition of loss. If your interpretation prevails, why aren't the losses that derive from return of fees not recoverable anyway because they're not within the definition of loss? Because if customers or clients would be assured, because the definition of professional services is services performed by professional liability assured or others on its behalf for customers or clients, so the carve-out from the exclusion of loss would only apply to fees paid to customers or paid by customers or clients, I'll be assured. I guess I'm not talking about... Is that a carve-out or is that just the definition of what's a loss? No, the definition of loss is judgments, settlements, cost charges and expenses, which is basically defense costs. And then in all these policies, they have carve-outs from loss, and it can be like a loss that's uninsurable by law. But it says fees, premiums, or commissions charged to customers or clients. It doesn't actually say the assured customers or clients or anybody else. It's broader and it doesn't have... I guess you were sort of saying that applies to the insured. Yeah, and that would be... Of course, that's loss, and these claims are for damages. So it's the recovery. It actually jibes exactly with C-9, and that C-9 exclusion is about the return of fees when clients... Wait a minute. I want to say that it's loss, not damages, but if I understand it, the underlying coverage provision that you're relying on is a coverage provision that addresses losses, which the insured shall become legally obligated to pay.  So I don't understand how calling something damages even gets you into the coverage in the first place. Loss includes settlements, damages, cost charges, and expenses. There's a carve-out from loss for fees paid by customers or clients. All that means is that if fees are a component of the damages pursued by a client, for example, of a professional liability insured, that's not covered loss. It's not limited to a professional liability insured. It just says customers or clients. It doesn't... Correct. So all it is is those fees aren't recoverable. It's exactly the same point that the C-9 is achieving, is that insurers don't want to recover fee disputes between insurers and their clients, but it doesn't actually exclude all claims by a client that have maybe as a component of the loss they're pursuing fees. But most importantly, when it comes to the C-9 exclusion, it was narrowly drawn to the insured, and the DEMA clause only expands what energy has been included in insured. Right. I think we have your argument on that. I know we're going to get to hear from you again. I'm sorry I kept you from your time. No worries. Let's hear from your counterpart, Terry Wolters. Before you launch into your actual argument, can I ask you a housekeeping question? I don't see any indication that AIDS-Bermuda Insurance, American International Reinsurance, or CHUG, participated in the district court proceedings. Am I right that they are not actually out of these here? Those are what we call the Bermuda insurers, and yes, they're not in this. They're the third-level access carriers. Okay. Thank you. Thank you. Please record. The decision of the district court should be reversed for the independent reason, and it's the primary reason that the district court relied on, related to the DEMA clause. And the reason is the DEMA clause isn't triggered and doesn't apply here and can't be used as the district court used it. The DEMA clause cannot apply because the banks, who are the third persons or entities other than an initial insured, were never performing professional services on behalf of the professional liability-assured RSC. The language of the DEMA clause itself requires that the banks, these third parties, that insurers be performing professional services for it to apply. They were not, and it can't apply. The structure of the policy and the claims actually being asserted in this case require it as well. You can go straight to the DEMA clause, you look at it, and you see that the only reasonable interpretation of the DEMA clause is to require the originating banks, the third-party entity, to render professional services on behalf of RSC. There's no dispute the banks weren't doing anything on behalf of RSC, and there's no dispute they weren't rendering professional services. That's where the district court made its mistake. The DEMA clause is never triggered. He never really, well, yes, I'm sorry. One of the things that I'm struggling with a little bit, so I want to make sure I understand it. Your position is the banks are not any person or entity for whose conduct professional liability-assured is legally responsible in rendering or failing to render professional services. No. Our position is that in the context of the DEMA clause, those banks are the third party. Are they third parties for whom the professional liability-assured is legally responsible in rendering or failing to render professional services? Well, that's several questions. They are not, they weren't rendering professional, excuse me, they weren't rendering professional services on behalf of RSC, the professional liability-assured. That's the rub. That's what the court got wrong. So this is where, this is where I'm struggling a little bit. The language that you're relying on is identical to the language in the provision that creates the coverage in the first place. It's not identical, but that's, they're sort of... They're identical insofar as it creates coverage for wrongful conduct by any person or entity for whose conduct of professional liability-assured is legally responsible in rendering or failing to render professional services. So if your position is the originating banks aren't rendering professional services and that that phrase requires that they be rendering professional services, not only do you knock out the DEMA clause, but doesn't that prove too much? Don't you knock out coverage altogether? Absolutely, that's not correct. Okay, tell me, help me understand. Well, because we're not relying, the plaintiffs in this case are not relying on the conduct, the wrongful acts of the originating banks. The wrongful conduct we're relying upon occurred later, it's temporally separated from that, and it requires the separate independent act of RSC, and that separate independent act, separately incorporated, is the act of purchasing those loans. Until RSC actually purchased those loans, they reviewed them, they vetted them and said whether they were going to purchase them or not, but until they did that, there was no liability at all, none. So you're saying that they should have identified the illegal fees in the process of securitization and reviewing the loans that they were securitizing, that that was their direct... You're exactly right, Your Honor. What they shouldn't have done, and the policy says loss resulting directly from, and the direct act by the RSC in this case is when they looked at those loans before they purchased them, they didn't discover that those loans were tainted loans, there was something wrong with them. So it was their own conduct, and that's directly what caused their liability. Without the purchase of the loans, there was no liability on their behalf for the conduct of the banks ever. To answer the question of whether the liability here arises from the Red Cap's own conduct versus deriving from the conduct of the bank through the operation of the statute that makes Red Cap... Those are sort of the two different theories here, and you're saying no, it's Red Cap's own conduct. Would we have to look at the judgment in the Mitchell action and the complaint in the Kessler action to understand whether your assertion about what the basis for liability here is right, or how do we decide which of those two, both of those theories of liability could apply? How do we decide which is accurate? Well, all you need to do is look at the complaint in each case, and you will see that we allege in both of those that RSC, the professional liability assured, purchased those loans. That is the wrongful act, and that's plainly alleged in both the consolidated amended complaint in Kessler and in the Mitchell case. That's the wrongful act. Could you spell that out a little bit more for me? The purchase itself was unlawful because... The purchase was unlawful because they didn't vet those loans sufficiently to know that those loans were tainted loans. Once those loans were tainted, then... And they had a common law or a statutory obligation to vet those loans. We believe that's what 1641D says they were supposed to do, the federal statute. So it's not a common law claim, it's a federal statutory claim? The liability that was imposed after that bottom was imposed by 15 U.S.C. 1641D. That's the only basis for this derivative liability that occurred when they bought the loans. And that is not... It's not vicarious liability at all. Okay, your distinction is vicarious versus derivative. Absolutely. Absolutely. Vicarious liability occurs when there's an act, and you have a relationship at the time of that act, and then you become liable immediately on the occurrence of this act. That's not this case. I understand that distinction, but what I'm now struggling with is the notion that when you're derivatively liable, then you're being held liable for your own conduct. It seems to me that when you're derivatively liable by definition, you're being held liable for someone else's conduct, that by operation of law, you're being held responsible. So you understand, that is the Route 2 coverage claim that you're talking about, and the right Route 2 coverage. We are not now, and never have made a claim under Route 2 of coverage. Our claim has always been posited on the wrongful acts of RSC itself. We have never posited this claim. But what makes those acts wrongful? Because you just said there's a statute that makes them derivatively liable, but that doesn't make them wrongful. They didn't have to purchase the loans. There's nothing that makes it wrongful to purchase the loans. There is something that makes them derivatively liable if they do so. The statute does that, yes, but their wrongful act, it doesn't rely upon the wrongful acts of the banks. Their liability directly results from their decision to purchase the loans. It's as simple as that, and that's what the policy says. If it directly results from their conduct, that's Route 1 coverage, and there's coverage for that. It doesn't matter about Route 2. Are you saying if 1641 had never been passed, they would be liable for their purchase of the loan? I'm sorry, I didn't hear you. If there were no statute, if 1641 didn't exist, they would be liable to the class on the moment they purchased the loan that includes the fees that the banks charged. Is that right? Excuse me. I'm trying to understand the non-derivative basis for their liability. Their non-derivative basis for their liability is they purchased the loans, and that conduct, they purchased the loans. What makes that wrongful under the law? It makes it wrongful under the law because those loans were tainted. They shouldn't have purchased them, and that's the wrongful conduct. Your complaint says you owe us in damages because you violated what duty? You violated the duty to vet these loans. They didn't scrutinize these loans closely enough. The policy says that's a covered act. And the duty arises from what? The duty arises from the statute. It says you're supposed to secure it, you're supposed to review them, and when you do, that's the outcome. And when you say the statute, you're not talking about 1641. You're talking about something else? No. Given the existence of 1641D, they were supposed to look at, vet these loans, and not purchase them. And when they did, that was their conduct. There was no liability that it was extended at all based upon the originating bank's conduct, which sometimes occurred years earlier. They had no liability then. They didn't look at their loans closely enough as they should have. That's the conduct that directly results in their liability, which is coverage under Route 1. We're not making a claim for coverage under Route 2. The policy itself and structure distinguishes between RSE's conduct and the conduct of the originating banks. No, I think we have your argument, so thank you. Okay, thank you. Good morning, Your Honors, and may it please the Court. Contrary to Mr. Chopra's submission, the insurers have always focused laser-like on the plain language of the policy, and we fully agree with Judge Etkin's well-reasoned decision that this case, this appeal, can be resolved, is resolved by a straightforward reading of unambiguous words. Start with the policy's basic insuring agreement, as Judge Robinson pointed out, which covers claims, quote, resulting directly from a wrongful act committed by a professional liability assured or by any person or entity for whose conduct a professional liability assured is legally responsible in rendering or failing to render professional services. In other words, the assured is covered both for its own wrongful acts in rendering professional services and also for wrongful acts committed by others if the assured is legally responsible for those acts in providing its professional services which trigger coverage. But an assured is not covered for all wrongful acts. We know that as relevant here. The fee of exclusion bars coverage for claims for return of wrongful, quote, premiums, return premiums, fees, commissions, costs, expenses, or other charges paid or payable by or to the assured. And then, as Your Honor pointed out, to ensure that the exclusion is coterminous with the insuring agreement, the Deamer Clause, what is referred to as the Deamer Clause, uses identical language to define the term assured as used in the exclusion and others, but not elsewhere in the policy, to include, quote, any person or entity for whose conduct an assured is legally responsible in rendering or failing to render professional services. In short, Your Honors, if a claim alleges that RFC, in rendering professional services, either wrongfully receives fees itself or is legally responsible for a third party's wrongful receipt of fees, then the claim is excluded, and that is exactly what occurred here. One of the things that I struggle with with my position is this concept of what it means to render professional services. And it's a defined term, and it talks about rendering services to customers. I'm trying to figure out how buying loans and reselling them or bundling them in the car of a security agent is a service to a customer rather than a commercial exchange between buyers and sellers of products, which seems to be a – buying and selling products seems to be beyond the scope of what I would think of as professional services to customers. So that's actually a position that we have reserved on, and the bankruptcy court rejected our position on that. And if the case comes to this court, I think everybody assumes that RFC was providing professional services. Right. Of the kind that you're skeptical of. I don't – I'm not questioning your skepticism. I'm just saying that hasn't been briefly represented here. No, I know that's not – but it does end up becoming critical to the – I mean, it's relevant to the existence of coverage in the first instance, but then that assumption kind of permeates some of your arguments about what the DEMA clause means. And because you're saying the DEMA clause means RFC's conduct in rendering of professional services refers to RFC, and RFC is doing so in buying and selling.  And so – or are you just accepting for the sake of argument that they're doing it? Yes. That's what – for the sake of this appeal, we're accepting that those – what you described skeptically as professional services qualify as professional services, and with respect, I don't think it affects the nature of the argument here, which is accepting that that is – those are professional services, that RFC was – in providing those professional services, RFC was held legally responsible for the wrongful receipt of fees by the banks, because, as the colloquy we just heard, I think, spelled out, under the federal statute, RFC is made automatically responsible, derivatively responsible, vicariously, strictly, you can use any adverb you want, and the point is that RFC is – and the best way to describe it is legally responsible for the bank's receipt of fees. Right. I'm struggling a little bit with the notion that whether this term that's sort of integral to this legal analysis, we're now asked to assume it means something, but reserve for some future date the possibility that someone might argue it means something else, and that – I understand that's the posture we have, but I am struggling a little bit. I mean, I guess I understand, but it's not that uncommon, I will say, in insurance cases – I'm abstracting a little bit to say we'll assume coverage for the moment, and the case can be resolved because no matter who's right about coverage, you can accept their view of coverage, which is what we're talking about, and exclusion is going to apply, and that's all we have here. And that's the point here is we accept for the moment the bankruptcy court's determination that hasn't subsequently been litigated that – You're accepting the conclusion that in the end you might dispute. If this case were to turn around and we end up – You're accepting a conclusion contrary to what might be your client's best interest on that limited question. As is common in complex litigation, right? You take different – you know, assume certain things, make alternative arguments. We're accepting that premise now because accepting that premise, they still lose because the exclusion plainly applies, and their argument today, I think, only confirms that. Could you address Mr. Chopra's high-level explanation of why Judge Etkin was wrong in dismissing the V before assuring its significance on the explanation that sometimes in the common law, you know, we want to have this – it's an insured doctrine, but as to not-so-noxious behavior, we don't apply it the same way. Right. So the innocent insured doctrine isn't really – it's not really a doctrine. It's a reading of policies, a particular type of policy that has literally only been applied in all of the history of the law to a multi-insured situation, as I think Judge Robinson pointed out, when you're talking about two insureds who actually have a right to coverage under the agreement, who are actually insured under the agreement. And I think the questions – the cases exemplify it. The Bucket is sort of the wellspring, watershed case on this, and it exemplifies exactly how that doctrine is supposed to – doctrines such as it is, the reading of the policy is supposed to work, which is, in that case, you had parents and a child who were insured. So each of them had a right to coverage under the policy. The child committed an otherwise excluded intentional act, and the parents wanted coverage, and the insurer said, well, it says the assured – you know, there's no coverage if the assured commits an intentional act, and they said the child was the assured, and the court said, well, that doesn't make any sense. It's the parents who want coverage. It doesn't matter if another insured committed an intentional act, right? That's not what's going on in this policy. This policy is written like the opposite of that, not necessarily explicitly to address that, but it can't be reconciled with that principle because, of course, it says very explicitly, it defines the assured to include that, you know, another entity who is not an entity that otherwise has insurance rights. It's only for purposes of the exclusion. The assured, as used in the exclusion, is defined to include not just RFC, but also an entity for whose conduct it's legally responsible. So the assured is defined to include both the assured and the other entity, as if, in the post-doctorate case or another case, the policy was written to say the insured includes the parents and a child for whom the assured is legally responsible, right? This is exactly the kind of situation where a so-called innocent insured doctrine doesn't apply because that other entity is defined into the assured, and the bankruptcy court was so completely wrong in saying that this construction reads the word the out of the policy. It doesn't at all. It accepts. I think it's the natural word to use in the exclusion is the assured, and the Deamer Clause simply says, and counsel is exactly right, it defines assured for the purposes of the exclusion. It doesn't create additional coverage. It just says, for the purposes of the exclusion, the assured is not just RFC, but also, in this case, the originating banks. So there is no innocent insured situation because the banks aren't insured. They're just defined to include assured for purposes of the exclusion. Thank you. The other arguments, I think the plaintiffs make two additional arguments. I think they were focusing on the providing professional services argument, but I heard, I think, some arguments that bleed into what I think of as the legal responsibilities argument, the point being that the assured argument is that the assured is legally responsible for another entity's conduct only if they're controlled or supervised. That's definitely wrong. Can you jump in? Those are arguments that were sort of made in the briefing, kind of assuming that we're in what counsel described as track two of the coverage. Can you respond to the argument that that isn't even the basis for the underlying coverage in the first place? It's your client's own conduct in purchasing the— Right, and that was going to be the point I wanted to address on this legal responsibility because I think the contractual interpretation arguments we didn't really hear this morning, but there is this argument that it was their own conduct. But I think all the answers to the questions just confirm the point. As you recall, all of them kept going back to the statute, which makes RFC legally responsible for, derivatively liable for. Again, you can use whatever adjective or adverb you want, but regardless, RFC is only a defendant in those cases because the statute makes them legally responsible for the bank's originating conduct. There is no independent tortious act. Missouri law doesn't prohibit the purchase of a tainted loan. It is true in a but-for sense that the liability— they can only be held liable because they purchased a tainted loan, but they're not liable for that. They're liable because of that in that sense. They're liable for the bank's receipt of fees because the statute makes them liable for the bank's receipt of fees. That's legally responsible. I understood counsel's argument when we were pursuing that question. He seemed to suggest that there was an independent obligation to vet the loans before purchasing them, and I'm still perhaps a little unclear as to the source of that obligation, but I would like to hear you as to why we shouldn't be troubled by that argument. With respect to it, I think you're unclear on it because it doesn't exist. There isn't an independent legal obligation to vet loans. It's a practical business obligation because everybody knows what the statute says, and if you acquire a tainted loan, you're going to be held automatically liable. That's just how the statute works. In fact, it's like the opposite. There's no defense. There's no defense under the statute. If you acquire a tainted loan, you can't say, I vetted it for months and I got all kinds of information. In fact, they lied to me. That's not even a defense. The only defense under the statute is whether or not you knew it was a covered mortgage loan, but all of these diligence arguments have nothing to do with liability under the statute. It is automatic. It's derivative, and that's why, just as counsel kept saying, ultimately RFC was held liable for it. The last point I want to address, Your Honors, is on this question. It's the symmetry between the insuring agreement and the exclusion as to who was providing the professional services. In this case, clearly, as we started off in our initial colloquy, the RFC is assumed to be the entity providing the professional services, and that follows directly from the language of the insuring agreement, again, which is coterminous with the exclusion. It's not that the banks are supposed to be the party that is rendering the professional services. Here's what the insuring agreement says, resulting from a professional act committed by a professional liability assured or by any person for whom they're legally responsible in rendering or failing to render professional services. That in rendering or failing to render professional service has to modify the professional liability assured. Otherwise, there's no coverage. You wouldn't even be talking about it. So it has to modify, in that context, professional liability assured, and then it just inserts right there, basically, and also anybody for whose conduct you're legally responsible, in rendering those coverage-triggering professional services, and then the exclusion is just doing the same thing. It's just adding that other entity and saying, for purposes of— excuse me, the Gainer Clause is doing the same thing and saying, for purposes of the exclusion, not for any other purpose, for the purposes of the exclusion, that professional liability of the assured, rather, is defined to include that same entity, a party for whose conduct the assured is legally responsible when the assured is rendering professional services. No further questions? We ask that you affirm. Thank you. Thank you. Attorney Rosenthal. May it please the Court. Gordon Rosenthal, Cahill & Gordon for Swiss Re. I'm arguing the cross-appeal with respect to the application of Exclusion 3T10, the Mortgage Fee Claim Exclusion. District Court held that that exclusion does not apply. We submit that's error. I note that this is a conditional cross-appeal. If the Court affirms on 3C9, the omnibus fee exclusion, then the cross-appeal is moot insofar as Swiss Re. is concerned, and the Court need not reach the issue. 3C10 is marvelous in its simplicity. It simply excludes the defined term, Mortgage Fee Claim. The definition includes fees in connection with loan origination, loan processing, and loan closing. Those are precisely the types of fees that give rise to the underlying claims here. The definition is very broad. It uses a rising-out-of language. Rising-out-of under New York law, Mount Vernon, and under Michigan law, Vanguard, has a but-for causation requirement. But for these fees and the charging of these allegedly unlawful fees, there would have been no underlying claims, irrespective of Route 1 or Route 2. Can I ask, if you were to reach that argument and you were to prevail, the result wouldn't be no coverage. It would be coverage limited to costs, charges, and expenses? That's correct. Okay. I just wanted to make sure I understood. Yeah, no, that's exactly correct. Again, there would be no underlying claim but for the allegedly unlawful fees. Now, the definition of Mortgage Fee Claim applies to fees paid to or by a professional liability assured. RFC, of course, was de-assured and was a professional liability assured. RFC, however, did not receive the challenge fees directly. RFC, as Mr. Hacker argued, was legally responsible for fees received by the originating banks. We submit that the Legally Responsible Clause applies to the Mortgage Fee Exclusion. The District Court's conclusion to the contrary we submit makes no sense for two reasons. One, we looked at the structure of the policy, and two, we looked at the language of the policy. Looking to the structure of the policy, as Mr. Hacker said, the Legally Responsible Clause in the exclusions parallels the insuring agreement, as Judge Robinson has noted. Both apply, and Exclusions 3C, to which the Deamer Clause, the so-called Deamer Clause, I think of it as the Legally Responsible Clause, Exclusion 3C applies only in the context of insuring agreement 1D, which is professional liability coverage for professional wrongful acts committed by wrongful, by professional liability assured. We submit that it makes no sense that the Legally Responsible Clause in Section 3C does not apply to wrongful acts for which professional liability assures are derivatively, vicariously, or whatever liable, because that is the entire context of insuring agreement 1D and 3C, Exclusions 3C. All of them apply to wrongful acts by professional liability assures. With respect to the language of the policy, the exclusion, as I mentioned, incorporates the definition of mortgage fee claim. The mortgage fee claim uses the term professional liability assured. The Legally Responsible Clause in the exclusions refers to the term assured, and it is this supposed mismatch that the district court focused on and said that because the Legally Responsible Clause uses the word assured, it does not apply to the definition of mortgage fee claim, which refers to the term professional liability assured. Assured, however, is a defined term, and it is broader than professional liability assured, and specifically and explicitly includes a professional liability assured. It makes no sense for the district court to fault the drafter of the Legally Responsible Clause in the exclusions for referring to assured rather than professional liability assured because the drafter used a broader term. We submit it cannot and should not make an outcome determinative difference whether the drafter of the Legally Responsible Clause used the word assured or instead substituted the four subcategories of assured that are explicitly defined to be assured. No drafter of any insurance policy or any other instrument could feel comfortable using a defined term which is broader than an explicit subset if the district court's opinion were correct. Simply put, the underwriters here did not sell and GM did not buy coverage for mortgage fee claims except as respects cost charges and expenses. Thank you. Thank you very much. Appreciate your evidence. Thank you. Now I think we hear again from Tony Chilcott. Your Honor, just a few brief points. The first is going to the loss carve-out. The fact that loss does not include fees charged to customers or clients does not mean that it excludes all loss in connection with a claim for fees paid to an assured under C-9. They're not coterminous. The carve-out from loss is far narrower by the plain terms. The second point is counsel repeatedly referred to the fact that the Diemer Clause says the assured is defined to include another entity. But the Diemer Clause did not say the assured. The Diemer Clause simply added another entity to the term assured and did not address the phrase the assured. The district court's error is not understanding that the custom and practice for 60 years across the nation is that the assured or the insured has meaning and that meaning is only the insured that engages in prohibited conduct. In multifood, this court reversed the district court that didn't consider custom and usage. And, indeedly, this court looked to the common law definition of customers when interpreting an undefined term in D&O policy. The district court erred, ultimately, in finding that the plaintiff's interpretation of the assured was not another reasonable interpretation. And, of course, when there's two reasonable interpretations, this court should remand for consideration of the extrinsic evidence. And that leads to the third point I'd like to make. The district court ignores and the plaintiffs ignore, and the defendants ignore. When they say that the originating banks did not have to perform professional services, they ignore 15 years of letters and statements in Greece to the opposite. When they denied coverage in 2003, they wrote, there is no coverage under Route 2 because the originating banks weren't performing professional services. In 2004, they wrote the same. In 2008, they wrote the same. In 2018, in a brief before the bankruptcy court, they wrote the same. I guess I thought I heard your counterpart say, for purposes of this appeal, we're putting that argument aside because even if your interpretation is right, we went on the exclusion. Well, for sure, Your Honor. My counterpart said, since RFC in the settlement process secured coverage under Route 1 to coverage for RFC's own wrongful acts and failure to renew the loans, the second route to coverage doesn't apply, so the Diemer clause shouldn't apply. I certainly am arguing that even if the Diemer clause were to apply, the fee exclusion doesn't apply here because RFC was not the assured that received the fee. No, no. I'm referring to your counterpart across the aisle. Well, Your Honor, the point being is the district court found that in the Diemer clause to apply because it found that in rendering professional services modifies legally responsible. Now, of course, that was an absolutely unique finding and an interpretation. The insurers for 15 years had argued that in rendering professional services modifies person or entity, which, of course, is the plaintiff's position now. The insurers then switched their position and said in rendering professional services modifies the assured. Why do we care at this point what they argued before? Are you making some sort of estoppel argument? Well, it's great you raised that because Swiss Reis admits they made that statement, the plaintiff's interpretation for 15 years, and said it's not estoppel. We're not arguing estoppel. We're arguing the following. The fact that the insurer's interpretation now of professional services modifies the assured is contrary to the definition of professional services, which is assureds can't perform professional services, makes that unreasonable, and it makes the plaintiff's... You think the assureds can't perform professional services. You mean the banks can't perform professional services. No. Assureds can't. The definition of professional services provides that assureds can't perform professional services, other than professional liability assurances. Right. So a subset of professional liabilities can't. Correct. Correct. So the point being is that the plaintiff's interpretation, which comports with the definition of professional services, is another reasonable interpretation. And when there's two reasonable interpretations for an exclusion, because it's their burden for an exclusion to show there's only one reasonable interpretation, when there's two reasonable interpretations, the district court should have considered the extrinsic evidence. And the extrinsic evidence is only one-sided. It is only 15 years of insurer conduct interpreting that same phraseology in the insuring agreement, which they admitted today mirrors, in saying that the person or entity had to be the one performing professional services. And I'll make one additional point on that, Your Honor. Seven of the eight insurers do not have a choice of law clause, and they've taken the position that when there is a conflict of laws between Michigan and New York, Michigan law applies. Michigan law is clear in Stryker that extrinsic evidence can be considered in determining if there is an ambiguity. And Michigan... We get there only if we find an ambiguity, if we conclude it's ambiguous. No, no, you get there, Your Honor. You get there because there's a conflict of laws between New York and Michigan on what's considered to determine if there's an ambiguity. Michigan courts consider a course of conduct by the insurer in determining an ambiguity, and the course of conduct by the insurers in this case, for 15 years, was to say that the interpretation of the plaintiffs was the correct one. That makes this phrase, by definition, it's ambiguous as to which phrase is being modified by in rendering professional services and should be remanded. Okay. Thank you very much. Last but not least, Attorney Rosenthal.  Oh, thank you. Walters. Thank you. Chuck. Your Honor, I want to go back and explain a bit about a question that was asked, and that is about HOPA, the 1641d. HOPA does not change the terms of the policy. And you were asking, you know, about the wrongful act. There is a definition of wrongful act in the policy. Mishears or negligence can be a wrongful act. And to go back to RSC's wrongful act as defined in the policy, their error was to purchase these loans. Their negligence was not to vet these loans before they purchased them. That is Route 1 coverage, and it exists in this case. To respond to your colleague's argument on the other side, if they were able to come in and produce lots of evidence that they thoroughly vetted these, but they had maybe been lied to by the banks or something like that, would that defeat their liability under the statute you're relying on? If they could show that they actually did very carefully vet these loans, but that they had been lied to in a way that was perfectly understandable, didn't reflect culpability on their part or negligence on their part, and that's why they went through with the purchase. In that scenario, would they still be liable under 1631D? Well, they would still be liable. You're saying they did, they could show they still vetted them. Well, they purchased the loan, which is also an error as defined in the policy. The mere purchase of the loan is an error as defined by, as given the wrongful act definition. We're trying to figure out whether there really is an independent wrongful act. And I was just trying to understand, because your theory is that that statute creates a legal obligation to vet the loans rather than practical needs to vet the loans. Well, you could say that it's both. If you look at the Mitchell case, I think Judge Del Nero, who tried that case, indicated that they had a duty to vet those loans. I don't believe she tied it to 1641D. Right, but there's an independent state law claim there as well, wasn't there? There was a state law claim there as well as, yes, there was, to answer your question. And in the Kessler case, those are federal law claims under HOPA. And I want to talk just very briefly. Your counterparts here said that these claims would not exist but for the fees. That's not a correct statement. There were other violations, if you will, that weren't fee violations. They collected interest when they should not have in Mitchell. And there were several violations in… You're talking about the originating banks. What's that? You're talking about violations by the originating banks, right? No, I'm just talking about the loans themselves, what was wrong with the loans themselves, not violations by the originating banks. What I'm saying is that in the Kessler case, these loans, there were prepayment violations, there were three-day notice violations, there were APR disclosure violations, there was nondisclosure of the ABA, the Affiliated Business Arrangements. Those were all things that made these loans tainted that weren't related to fees at all. But when you said they weren't related at all, I understood the theory. There are kickbacks, there's a lack of disclosure of the kickbacks, and the way those are manifested is the charging of excessive fees to fund the kickbacks and the relief side is a return on those excessive fees. I mean, doesn't it all still run through the fees? No. No. If you look at these things in the Kessler and Mitchell, the interest isn't fees at all. And the claim says four fees paid to or by. Those other claims I'm talking about aren't fees paid to or by. That's the reason that there are violations for reasons that are unrelated to and not fees. And if you look at our petition, the joint consolidated amended complaint in Kessler, you will see that. I want to go back to the question about the... Wrap it up, Bill, because we're... I'm sorry? You can make a closing point here. Okay, thank you. I understand I'm about out of time. One of the other things that... HOPA does not change the insuring clause or the language of the policy. So if we fit, our claims fit under the policy, there's coverage. Second, they keep talking about, the defendants do in this case, Route 2 coverage and the Deamer clause. That only applies to Route 2 types of claims. We're a Route 1 type of claim. The Deamer clause is really irrelevant to, under the structure of the policy, the Route 1 claim for our own conduct. The Deamer clause has no pertinence there. And we've got some examples in our replied brief of that exact situation. I think you've been clear about the Route 1, Route 2 distinction. Anybody got any questions on that? Really appreciate your... Thank you. Thank you both. We will take this under advisement. Appreciate it. Next up, we're going to hear in 24-25-63, Disability Rights New York versus New York DLA. I'm just going to let it settle a little bit more here. All right. Attorney Asbee. Good morning, Your Honors. May it please the Court. My name is Christina Asbee, and I represent Disability Rights New York, the appellant. Before this Court are two appeals filed by DRNY against New York State Department of Corrections and Community Service, which I will call... I'm sorry, Community Supervision, which I will refer to as DOCS. The issue in this first appeal, DRNY 1, is whether or not the district court committed reversible error when they denied prevailing party fee status to DRNY, and also when they made a conclusion that our fees and hourly rates were excessive. I will discuss three points today. First, that DRNY is the prevailing party under the Lackey v. Stinney bright line rule. Second, that the court should reject DOCS's overly broad interpretation of the Lackey decision. And third, the district court needs guidance on the correct legal standard to apply when calculating prevailing party fees. In this case, DOCS withheld... The underlying case, DOCS withheld records that DRNY requested pursuant to its federal authority as a protection advocacy agency for New York State. Access to records is an essential part of the work that DRNY does, because what we do is protect people with disabilities that are housed in DOCS facilities to ensure that they're not suffering from abuse and neglect. So much of the work that we do requires access to records and careful review of those records. We were forced into court for this case in 2018, and we litigated it until the bitter end. In this case, DRNY received... But what you received was not a judgment in your favor. You received a dismissal as moved. And your adversary argues that that's because after enactment of the New York law, they turned over all the records as required by that law, that that's what secured any access that you got, not the lawsuit. You know, you do say some of what the Supreme Court said last term in Lackey v. Stinney about what it takes to be viewed as a prevailing party. So why don't you focus on why you think you satisfy the requirements stated by the Supreme Court? Yes, this... We are the prevailing party at the motion for reconsideration. Under Lackey, it is, because it was a final order. It was a summary... It was a second summary judgment where the court included its decision on the motion for reconsideration. And what the court did was it went from its first conclusion of law in the first summary judgment filed by Dock that said that DRNY is... That the federal protection and advocacy laws require that DRNY as a P&A for New York State must physically go to each of the Dock facilities where Dock houses the records for the individuals that we need access to their records. We must physically go, tab each page we want copied. We were not allowed to copy records at the facility when we were there. And then we have to go back to our office and we have to pay for the records and then Dock will send us the records. Okay, so that was what the first determination of law the court made in the first summary judgment decision. In the second summary judgment decision, the court reversed its position on that. It said, actually, the protection... I changed my mind. The protection and advocacy act do not require the physical inspection as a prerequisite to getting copies of records. What is required is a sufficiently identifiable request. And in the facts of this case, we met that burden because our records requests were... The records that we requested were produced. But the court determination didn't meet that burden. It didn't change its denial of your summary judgment or your preliminary injunction. We didn't have a preliminary injunction in the first case. So that's a fundamental distinction between LACI. So LACI's Brightline Rural Test, while it does apply in this case, it's not in the same context as it did in the actual LACI decision. So in this case... Getting it, succeeding on a preliminary injunction, is not enough to be viewed as a prevailing party. You failed on your... We didn't have a preliminary injunction in this case. That's in the second case, DRNY2. And this is the first case where we're right out of the... So what is it that you think you've prevailed on that satisfies LACI? Well... Okay, the LACI test requires that you have enduring relief that changes the legal relationship between the parties, and that it is judicially sanctioned. And that just means a court order. In some ways, it can be interim court order. It just has to be final on merits. And so in this case, right out of the gate, DOCCS filed its first summary judgment. They didn't file an answer. They just filed a summary judgment after we filed our complaint. We did not file a preliminary injunction in this case. And so out of the gate, they filed a first summary judgment. And so, again, I already explained that. The court said the physical prerequisite, and then only in the second summary judgment order did they rule on the law that the P&A does not require the physical inspection. Importantly, DOCCS imposed that physical inspection requirement while they were briefing the first summary judgment. Are you saying that DOCCS changed its records policy in response to the reconsideration motion? No, before the reconsideration. It changed its policy at the time that they filed their first summary judgment. What was the judicial order that gave you the relief you were seeking? The second summary judgment that included the motion for reconsideration. And when the court granted that, it explicitly said that its ruling did not affect the ultimate disposition of the motion for summary judgment. So it didn't give you summary judgment. What did it give you? It gave us a legal conclusion on the law that led DOCCS to produce the records before the state law even was contemplated by the legislature for a while. It wasn't even a bill. It gave us a ruling on the merits. No, it gave us a ruling on the law. So the law at issue, it had changed its position. And even though the district court provides some mental gymnastics that somehow gets to a conclusion that's in DOCCS' favor, its conclusion on the law is very clear. And it was clear to DOCCS because DOCCS did not appeal that. The argument I take it is, even though it continued to rule against you on the summary judgment and say that in your case you do have to physically come look at the records because I, the court, don't think your requests are sufficiently clear, because the court said, but I didn't mean to say that it's always the case that even with a clear request you have to come look at it. And you view that as not just a moral victory or a helpful principle of law, but as a legal victory. It's a legal victory and a practical victory. Because what it meant was that DOCCS had instituted this physical inspection requirement prior to the first summary judgment order. After you filed, that's part of what's confusing me. When you filed suit, that physical inspection requirement didn't exist. Your confusion is right on point. I'm actually directing it at your argument, so don't endorse it too much until I defend it. The thing that you were challenging was they're not giving us these particular records. As the case is going along, DOCCS adopts a new principle that says you have to come in and physically look at them and mark them first. The court seems to, arguably, endorse that position in its first summary judgment. It comes back in the second summary judgment and says, no, I don't think you've misinterpreted it. I don't mean to say that's always the case, but it's still the case for you. So the relief that you sought, because we don't think your requests are sufficiently clear, the court said that. Now, maybe they turned around and just gave some records, but the court didn't change its ruling as to your entitlement to the relief you were seeking in the case in the second summary judgment, but your point is the court made a legal determination that was beneficial and became one of the goals that you were pursuing in the course of the litigation. Is that fair? At the time of the motion for reconsideration, because it was in a nonvoluntary way. Because they understood the records that we were requesting, and then they provided DRNY with the records at issue. No, they were not. Because that was still being constant. That was, in fact, they weren't under a court order because those were the issues, the issues that were going to be decided in the trial. Well, you're having a problem understanding how you got judicially sanctioned. You got that relief in a judicially sanctioned way. I mean, I'm looking now, it said especially that it was denying, it was clarifying the first summary judgment order's rationale, but it was otherwise denying the motion as both untimely and unsupported by a showing of cause for the reasons stated by DOPS in its opposition memorandum. That hardly sounds like you're a prevailing party. What am I missing? Well, the fact that the P&A records access provisions give us records. We get to inspect and copy records that we request, pursuant to our federal mandate to make sure that people aren't abused and neglected. So in doing that, imposing a physical prerequisite, as they did in the first summary judgment, that changed our legal position. It changed the legal relationship between DRNY and DOPS. And in the motion for reconsideration, they flipped the judge's order that said, okay, you don't actually have that physical prerequisite because I'm changing my position on my interpretation of the law. At that point in time, DOPS in an involuntary way had to produce the records because we requested the records and we didn't have a- In order to comply with the law as described, they had to produce them, not the court ordered them to produce them. Exactly. It was involuntary in the sense that, yes, it was not an explicit court order because that was a material issue, a genuine issue in dispute that was to be saved for trial. The litigation and disputing of principle of New York law and the New York Court of Appeals in another case entirely interpreted the law in a way favorable to you, that you're now a prevailing party under the standards that the Supreme Court just articulated in Laxey? I'm not quite sure I understand the question. In any event, thank you. We'll get to hear from you again. Thank you. Thank you. Attorney Brody. May it please the Court, Frederick Brody for DOPS. The district court order denying attorney's fees should be affirmed because plaintiff lost this case. DOPS made three motions for summary judgment. The first two were granted in part and the third was granted in full. Plaintiff moved for summary judgment twice. The district court denied both motions. At the end of the case, the district court entered judgment dismissing the complaint. Plaintiff was awarded none of the relief requested in the complaint. You can look in the appendix at page 41 at their request for relief. There was no declaratory judgment, no injunction. And no other relief. The district court said, though, in its decision on the third summary judgment motion, that based on the court's findings in the first and second summary judgment orders, as well as documents produced to DRNY subsequent to those orders, DOPS now has produced all the documents requested by DRNY and its demands. Doesn't that imply that the court understood that DOPS was producing these documents in response to the findings and actions it had taken? It does not. And that points to a misapprehension of the record in counsel's argument. Most of these records were produced in the ordinary course of business by DOPS. Nguyen's declaration, which is in the record, and particularly at pages 84 to 114, details the day-to-day back-and-forth between DOPS and DRNY over records production, over what records plaintiff was requesting, what records they received, and the logistics of plaintiff's payment. So DOPS moved that first motion for summary judgment. The theory of the motion was, this case is wrong because we produced these records. And DOPS ultimately showed that plaintiff received all the records it paid for. Sometimes plaintiff's payment came after the lawsuit had been brought, and then, of course, the records were produced after the lawsuit was brought. But DOPS did adopt this policy for a while as the litigation was underway. And it said, we don't have any complication to do your copying and mailing for you. If you want to come get them, come get them. And the court, even though it didn't give the sort of narrow relief or the specific relief subpoena, said no, that's not how the federal statute works. Maybe if the requests aren't sufficiently clear, you can require that they come or clarify their requests. But it did essentially reject DOPS's policy. And I'm assuming that following that order, DOPS changed its policy. Or am I wrong about that? DOPS changed its policy in response to the state PNA records in New York. So even after the court, even after the district court said, the policy that requires people to come in in person is not, I'm not saying that's lawful, that's not lawful. It's only in the context of inadequate requests. DOPS continues to do the thing that the court had just said it couldn't do? Well, no, no. Well, first of all, DOPS didn't, the court didn't say DOPS's policy was unlawful. The PNA acts require that DOPS give access to records. So DOPS said, okay, we're giving on-site physical access. You can come in any time, look at the records. It's immediate. And that was one of DOPS's arguments on the law in DRNY2, that on-site physical access means access. DRNY1 was filed in 2018. All of these 34 individuals, all of these records requests were under the prior system. DOPS did not adopt the physical access policy until 2019. So everything about the physical access policy in this case is dicta. Now, as far as 2019 goes, the district court did not say DOPS's physical access policy was illegal. Throughout the case, multiple times, the court held that physical access is access under the PNA acts. The court in the second, in the reconsideration opinion, gave a more nuanced description of the law where they said, okay, physical access is access, but DRNY, you can also get records through a written request if you make the written request sufficiently specific. Now, again, that didn't bear upon the requests here because the district court also said that the requests here, all 34 of them, were not sufficiently specific. So really what happened in the reconsideration motion was the court initially, first summary judgment motion, gave a broad holding DRNY, this is why you lose. In the reconsideration opinion, the district court gave a somewhat narrower holding or I would say a more nuanced holding saying DRNY, this is why you lose. You might, and I believe the court used the word might, be able to get records in the future through a written request if you meet these criteria of specificity. But that didn't bear upon the 34 individual records requests that were at issue here. Those records requests, and this goes back to my earlier statement, those records requests were all granted in the ordinary course of business and that was Dock's defense. Under Lackey against Finney, you determine who prevailed at the end of the suit. That is, when the matter is finally set at rest. That's 604 U.S. at 200. Here, the judgment conclusively resolves all of plaintiff's claims in Dock's favor. And the district court recognized this. The district court said plaintiff had not secured, quote, any form of relief on the merits, close quote, that materially altered the party's relationship. That's on page six of the special appendix. Now, if DRNY had actually won the case, the district court would have realized that. One moment, Your Honor. One moment, Your Honor. There were two cases where there was production following the reconsideration. And that was individuals Y and BB. And in those cases, Dock's had moved for summary judgment. Dock's file showed that the records were sent. And DRNY responded, we never received the records. So, obviously, issue of fact that precludes summary judgment as to Y and BB. So, Dock's went and produced the records. And then we got summary judgment on the whole case. The district court did not order Dock's to send those records, either in the reconsideration ruling or anywhere else. To the contrary, the district court agreed with Dock's. As I said, the physical on-site access is access to records under the P&A Act. And if you want confirmation that that was the actual ruling of the district court, they didn't say Dock's was being illegal, you can look at pages six to seven of the special appendix, pages 168, 223, 494 to 495, 510, and 514 of the appendix. And even if this lawsuit had spurred Dock's to produce records, let's say plaintiff brought the suit in 2018, and Dock's said, oh my gosh, we've been sued. We've got to produce all these records, and they produced them. Let's say there was that cause and effect pattern. That would be a catalyst theory bargain, which the Supreme Court has barred under Buchanan. And with respect to the New York P&A Records Act, I know that plaintiff argues that Dock's changed its practice in response to the lawsuit after the P&A Records Act was passed. Dock's complied with the P&A Records Act, the New York Act, because it's the law of the state of New York. It didn't have anything to do with this lawsuit. In fact, the record at page 381 shows that Dock's began complying on the act's effective date. That date didn't have anything to do with the lawsuit. It had to do with the passage of the act. Unless the Court has further questions, I'll rest on the briefs at this point. Thank you. Your Honor, in this case, in applying the bright-line rule that Lackey v. Stinney created, the rule did not change in any way from when we filed the petition for attorney fees from today. The rule stayed the same in this particular case, because what we are arguing is the Lackey v. Stinney rule, the bright-line rule that requires enduring release, judicially sanctions that materially alters the legal relationship between parties. 337, which is the district court's conclusion of the recent, the, let me get the date to be sure we're talking about the same document, the November 4th, 2020 ruling. And that's the one where after clarifying the law in three respects, the Court said that the ruling might have been different had the plaintiff done certain things, specifically identified in writing which records it definitely wanted copied, provided the necessary payment, and waited the necessary amount of time for doctors to retrieve. And therefore, you lost. You lost at that point because you had not done things that complied with the amended or revised construction of the law. So, again, I'm having difficulty understanding how you're a prevailing party. Your argument, as I understand it, is thereafter you made requests that satisfied the requirements the district court said were implicit in the law, and docs gave you the documents. But your lawsuit did not satisfy the construction of the law that the district court ultimately came to. I'm sorry, I'm trying to follow through. I think one... You lost your motion at that stage because the district court found you failed in the three respects I just identified. No, I respectfully disagree. Why not? Well, the requests at issue in this lawsuit, so from A to HH, I think, and then the RFP documents that we requested, or RTF documents that we requested, those requests never changed. We never resubmitted any requests during the pendency of this lawsuit. The requests themselves were at issue. So at the time of the motion for reconsideration, we didn't draft other requests. I understand that, and the district court explained that it wasn't giving you relief because your request did not satisfy the three conditions that it identified in its opinion. In the second motion, I'm sorry, in the second summary judgment decision, that was a question of facts that the court was reserving until the final disposition of the case. But in some of the requested issues, they made a final determination in the second summary judgment as well as in the first summary judgment. But our claims survived, and especially related to... I understand your claims survived. That's not a favorable decision on merit. That's not a matter of giving you enduring relief. It just lets your claims survive. Well, it did. It's our position that that second summary judgment decision, it did provide us enduring relief because at that point in time, the court told DOCS, you can't institute that physical inspection requirement. And that is the enduring judicial relief. And it's our position that DOCS involuntarily produced the records because they wanted to comply with the federal law, importantly the state law, was not at issue at this time. Thank you. Appreciate your argument. Thank you. And I have a feeling we'll continue in about two seconds because the next case is 2425-65, also the Familial Rights New York v. New York Department of Corrections. Good morning, Your Honor. We are still in the morning, so that's good. My name is Christina Aspey. I represent the appellant, Disability Rights New York,   We are challenging DOCS, New York State Department of Corrections Community Service, which we're again calling DOCS, we're challenging an appeal that's in, sorry, we are appealing a decision with the district court that denied us full prevailing party status in the second DRNY v. DOCS case. So this is one of three lawsuits, which the first DRNY 1 we just argued, and now we are focusing on DRNY 2 in this argument. Again, this case challenges, the underlying case challenges DOCS's holding of records that DRNY requested. I will not go through the reasoning why we need these records again because I did that in the last argument. In this case, again, like the last case, DRNY received the very release that we were seeking in the lawsuit, we received the copies of records that we requested. Nonetheless, the district court abused its discussion when it applied an incorrect legal standard to determine that DRNY did not have the prevailing party status for the entirety of the case. Additionally, in this case, the district court abused its discretion and committed a reversible error when it concluded that DRNY fees and hourly rates were accepted. In this case, we filed a mandatory preliminary injunction, and to get straight to the point, DRNY is the prevailing party under the LACI BC's bright line rule. In that rule, the court must consider whether a party achieved during judicial release beyond a transient victory and that it was judicially sanctioned. In other words, the district court must consider whether the court conclusively resolved the claim by granting the relief on the merit. In this case, the judicially sanctioned and during judicial release did come from the preliminary injunction. That is our position because the court concluded as a matter of law and fact, that we are entitled to the records that we requested under the... Yes, this case is... That didn't mean that they... That wasn't a summary judgment perhaps. It gave you preliminary relief. Some might understand LACI relief. I need to say that's not enough, but now I don't understand them to be challenging the award insofar as the district court gave it as to your success with respect to B, not A. But you want fees for the part of the preliminary injunction you didn't secure, right? It's our position that we were the prevailing party because we received... On A. On A and B because we... Well, B, nobody's challenging you're getting fees on that. But only a very point... LACI wouldn't support it, but it's not... There hasn't been a cross appeal on that. It's our position that the preliminary injunction...